Estate of W. R. Bassick, Deceased, Della W. Bassick, Executrix, v. Commissioner. Della W. Bassick v. Commissioner.
Estate of Bassick v. Commissioner
Docket Nos. 2978, 2979.
United States Tax Court
1944 Tax Ct. Memo LEXIS 33; 3 T.C.M. (CCH) 1234; T.C.M. (RIA) 44379; November 27, 1944
*33 Value of stock received by the decedent as compensation for services in connection with reorganization of the company, determined. Stanley Pedder, Esq., 405 Montgomery St., San Francisco, Cal., for the petitioner. T. M. Mather, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $1,519.38 in the income tax of W. R. Bassick for the year 1940 and a deficiency of $1,552.51 in the income tax of Della W. Bassick for the same year. The sole issue is the correct determination of the value, if any, of 812 1/2 shares of stock of the Hendy Realization Company received by W. R. Bassick as compensation for his services in connection with the reorganization of that corporation. Findings of Fact In the pleadings and at the hearing certain facts were admitted and stipulated and we adopt them as findings of fact. In so far as they are material to the issue, they are as follows: The petitioner, W. R. Bassick, was an individual residing in Mill Valley, California. The petitioner, Della W. Bassick, was his wife. The stock involved was the community property of the petitioners. They filed their income tax returns with the collector *34 of internal revenue for the first district of California. Since the institution of this proceeding, W. R. Bassick died. His wife was appointed executrix of his estate and the proceeding was continued under the above title. Joshua Hendy Iron Works, now the Hendy Realization Company, merely by reason of change of name, hereinafter called the company, is a California corporation. As of December 1940 there were outstanding 4,120 1/4 shares of the capital stock of that corporation. As of March 27, 1934, the company was in receivership under the laws of the State of California, and was apparently hopelessly insolvent. In 1935 the company petitioned under the provisions of Section 77-B of the Federal Bankruptcy Law for reorganization. A summary of the balance sheet which is a part of the petition for and plan of the reorganization shows the following: ASSETS
Current Assets, Cash, Accounts Receivable, Inventories, etc. (Inventories at book cost
- Physical inventories not taken)
$198,742.77
Capital Assets, Land, Buildings, Machinery and Equipment, etc. 724,564.93
Note from petition and plan: Stated at the book values, subject to write-down
for excess capital charges and insufficient depreciation and amortization taken in
prior years.
Other assets
9,148.23
Total Assets at Book Value
$932,455.93
LIABILITIES
Current
$ 96,387.28
Deferred liabilities - prior to May 17, 1932
623,170.14
Capital - Common Stock issued, less held in Treasury
$442,500.00
Less: Deficit
229,601.49
212,898.51
Total
$932,455.93
*35 Under the plan of reorganization which was submitted, and which was subsequently approved by the Court, and put into effect, the following concessions were made by different classes of creditors, the total reduction of amounts of claims by all such creditors being $73,853.06: (a) The bondholders reduced their claims by 10 per cent and accepted secured five-year notes, with reduced interest. (b) Another mortgage creditor reduced its claim by 10 per cent and reduced its interest. (c) Other secured creditors, likewise reduced their claims by 10 per cent and reduced interest. (d) Unsecured notes and accounts were reduced by 15 per cent, bore no interest for three years, and interest thereafter at 5 per cent payable only if earned, and then only after five-year maturity of the notes given for their reduced amounts. In view of these concessions by the creditors the plan as submitted and approved required the stockholders to deliver the whole of their stock to the board of directors of the company to be held by the board in trust as to 50 per cent thereof for the respective depositing stockholders, but such 50 per cent to be voted by the board for a period of five years and until *36 the extended obligations referred to above were fully paid, so as to leave the management of the company in the hands of its creditors, who appointed the board, with full power of that board, as such trustees, to vote for a reorganization of the capital structure of the company, as specified in the plan. Such a reorganization of the capital structure did not take place. As to the remaining 50 per cent of the stock so deposited by the stockholders with the directors as trustees, the latter were to hold them free and clear of any claims of the depositing stockholders and to distribute them, or any part thereof, in its sole discretion to the managing officers of the company as a reward for management and the rehabilitation of the company's affairs. In the course of the reorganization proceedings before the Master in charge of it, a general appraisal of the company's operating assets was made which indicated that the operating assets were not worth even approximately the amount of the book value. However, they were set up on the books in accordance with the appraisal, with the result that a deficit of $504,287.33 was shown by the books at June 30, 1936, the approximate time at which the *37 plan of reorganization became effective. The real estate in San Francisco, hereafter referred to, which stood on the books at $78,488.61 was not re-valued but remained at the old book figure at December 1940, and thereafter until sold in 1943. Similarly the so-called investments were not revalued, but stood at the same figure of $2,706.81 for the whole period from the closing of the reorganization until December 1940, and thereafter to this time. As shown by the annual reports of the firm of certified public accountants employed as auditors, this deficit was reduced by approximately $205,000 to $299,637.73 by December 31, 1939; thereafter and as of December 31, 1940 it had been further reduced to $220,399.88, but part of this further reduction was the result of the sale of the company's operating property as a whole. As of November 15, 1940, all of the company's operating property, including its inventory and going concern value and contracts, but not including the miscellaneous assets hereafter referred to, was sold and the proceeds of sale were first used to liquidate the remaining indebtedness of the company, part of which had been already paid from funds made available from *38 its operations. In the interim, and particularly in 1938 and 1939, the question of distributing part or all of the stock held by the trustees for the further compensation of management had been discussed but not acted upon. After receipt of the proceeds of sale above referred to in 1940, and the payment of all of its known liabilities, the necessary steps to commence dissolution of the company were taken, and thereafter a liquidating dividend of $45 a share was paid on the 50 per cent of the outstanding stock held by the trustees for the benefit of the depositing stockholders; no such liquidating dividend was paid on the stock held in trust by the directors for distribution to and compensation of management. At or around the same time cash bonuses were paid to the principal employees of the company in partial recognition of their services in the rehabilitation of the company, and the amount of bonus received by the petitioners was included in their tax returns. Prior to the commencement of dissolution of the company the stock held by the directors as trustees for distribution to the company's employees (or such of them as they might determine), as further compensation for services, *39 was likewise distributed and therefrom these petitioners received 812 1/2 shares, subject to a specific written waiver by the recipients of any interest in the funds on hand which had been ear-marked for a first liquidating dividend of $45 to the beneficial owners of the remainder of the stock. In November and December 1940, and at the end of that year, the company had the following assets: Book Value
Cash
$ 9,756.71
Accounts and Notes receivable
51,211.28
Deposits
154.75
Real Estate - San Francisco - Book
value
78,488.61
Investments
2,705.81
Patents
1.00
Prepaid taxes
678.45
Total Assets
$142,996.61
The company's books showed only the following liabilities: Accounts payable
$ 2,949.74
Social Securities Taxes and Federal
Excise Tax
2,055.67
Estimated Federal Income Tax
32,214.83
Total liabilities
$37,220.24
The record discloses the following additional facts: The San Francisco real estate owned by the company in November and December 1940 was sold in 1943 for $22,500. On or about November and December 1940, a number of sales of property within a few blocks of the company's land were made at 90 cents per square foot. The company's land contained *40 35,812 1/2 square feet. The accounts receivable appearing on the company's November-December 1940 statement were all collected. In later years its investments listed thereon proved to be worthless. In 1944 the patents were sold for $410. Additional liabilities of the company, aggregating $11,491.27 and consisting of state and federal taxes, plus interest, paid in full or compromised, were not readily or reasonably ascertainable in December 1940. No provision was made in the statement for the cost of winding up the company's affairs. Two employees were retained for several months to complete the liquidation and dissolution of the corporation. On November 23, 1940, attorneys for certain stockholders of the corporation notified its board of directors that, in their opinion, the sale of substantially all of the company's assets did not constitute a "successful rehabilitation" as contemplated by the plan of reorganization and requested that they be notified of any proposed action directing distribution of the stock to the managing officers. On December 20, 1940, the stock was authorized to be issued to Bassick and others. In 1941 a suit was started challenging the right of the directors *41 to make such distribution of stock. The action was brought in the Federal District Court and was decided in 1943, the court holding that the distributees were entitled to retain their stock. On the basis of subsequent experience and prices realized, value of the company's assets at November and December 1940 was $85,288.43 and its liabilities were $48,711.51, leaving net assets of at least $36,576.92. The valuation of the company's real estate at 90 cents per square foot results in net assets well in excess of $47,000. Opinion VAN FOSSAN, Judge: The issue is the correct valuation of 812 1/2 shares of the company stock received by the decedent, Bassick, as compensation for the services rendered by him in connection with its reorganization. As in all valuation cases, the issue rests entirely on the facts. The respondent has determined the value to be $10 per share. The burden is on the petitioners to controvert the value so found. The petitioner contends that the stock had no value at all. If this were true, its distribution to Bassick and the other managing officers would have been an empty gesture and the "reward for management and rehabilitation of the company affairs", a mockery. *42 It is not credible that he and the other officers of the company, who were thoroughly cognizant of its affairs, were guilty of such a course of conduct. That the respondent was justified in fixing the value of $10 per share is amply demonstrated by a glance at the assets and liabilities of the company at the end of 1940. If the net assets, exceeding $100,000, as shown by the books, be adjusted to reflect the actual value of the real estate, with liberal adjustments as shown by actual experience as to other items, there still remain sufficient net assets to give a liquidating value of $10 per share to the stock. The facts that the stockholders threatened suit and that certain taxes were undetermined and unpaid in December 1940 does not rob the stock of its entire value nor can the fact that the stock may not have a readily realizable value render it without value. Crowell v. Commissioner, 62 F.2d 51, affirming 21 B.T.A. 849. The company was in liquidation at the time and the reasonable prospective liquidation value of the stock must determine the amount taxable to Bassick. There was an ample margin of assets over liabilities *43 to warrant the finding that the stock had a substantial liquidating value. The respondent's judgment is that such value was $10 per share. See Crowell v. Commissioner, supra. Petitioner has not demonstrated error in his determination. Decisions will be entered for the respondent.